UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| In re<br><br>MINH VU HOANG and<br>THANH HOANG<br><br>               Debtors. | Bankruptcy No. 05-21078-TJC<br>Bankruptcy No. 05-25738-TJC<br>(Chapter 7)<br><br>Jointly Administered Under<br>Bankruptcy No. 05-21078-TJC |
| GARY A. ROSEN, Chapter 7 Trustee for<br>   Minh Vu Hoang and Thanh Hoang<br><br>          Plaintiff/Trustee,<br><br>         v.<br><br>DAVID DAHAN e al., | Adv. Pro. No. 11-00087-TJC |

**Plaintiff's Opposition to the Dahan Defendants'
Motion to Dismiss Counts I—VI of the First Amended Complaint**

**Introduction**

Plaintiff Gary A. Rosen, Chapter 7 Trustee for Minh Vu Hoang and Thanh Hoang, opposes the motion to dismiss Counts 1A–1C, 2A–2D, 3A–3C, 4A–4C, 5A–5C, and 6A–6C that has been filed by the principal defendants in this case: David Dahan; his daughter Karin Dahan and wife Sarit Dahan; Maia, LLC; Rokama, LLC; and Raymonde, LLC. (Those defendants (who we will refer to as "the Dahan Defendants") are the only defendants against whom the counts listed above have been asserted.)

For the reasons summarized here and set out in more detail below, the motion to dismiss lacks merit and should be denied.

Counts 1A, 2A, 3A, 4A, 5A, and 6A assert claims for an accounting under Bankruptcy Code § 542(a)—the Code's "turnover" provision. The Dahan Defendants argue

that § 542(a) is inapposite because it supposedly applies only to property that was in the debtor's possession when the petition was filed—a condition that is not satisfied here. But that argument (which the Court has rejected in another case) is wrong: it is at odds with other cases and (more importantly) it conflicts with § 542(a)'s plain language and legislative history. The district-court case on which the Dahan Defendants rely was wrong; among other things, it misinterpreted the legislative history by relying on a committee report that dealt with a version of § 542(a) whose language differed materially from the version that was enacted. And contrary to what the Dahan Defendants contend, that decision does not bind this Court.

Counts 1B, 2B, 3B, 4B, 5B, and 6B assert claims for conversion. The Dahan Defendants rely on the general rule that money is not subject to conversion, but the complaint alleges facts sufficient to invoke the exception for funds that are specifically identifiable. However, to eliminate any possible doubt, we ask that the Court grant us leave to amend the complaint further to more explicitly set out the factual basis for that conclusion.

Count 2D asserts a claim based on a promissory note executed by David Dahan and Maia, LLC in favor of one of Minh Vu Hoang's sham entities. The motion to dismiss this claim on limitations grounds is not well taken because it rests on a misunderstanding of what the count alleges. Contrary to what the Dahan Defendants seem to think, Count 2D asserts a claim to *enforce* the note, not a claim for *converting* the note. As a result, the statute of limitations began to run, not when the note was executed, but when it matured

one year later. The latter date is within the three-year limitations period as extended by the parties' tolling agreement.[1]

## Statement of Facts

### A.  Minh Vu Hoang's asset-concealment scheme.

Minh Vu Hoang was in the business of buying distressed real estate at foreclosure and selling it at a profit. (First Am. Compl. ¶ 33.[2]) Beginning at least as early as 1998, she undertook a complex and wide-ranging scheme to conceal her assets from creditors. (¶ 34.) The scheme was motivated at least in part by the fact that Minh Vu Hoang was continually being sued and that she wanted to impede her creditors from being able to execute on any judgments. (¶ 35.)

Minh Vu Hoang used a variety of methods in carrying out her scheme. When purchasing real property, she often caused the property to be titled in the name of a sham entity or of another nominee. (¶ 38.) She used more than 200 such sham entities, many of which were supposedly general partnerships. (¶ 39.) However, the purported partnerships were, in economic substance, merely names under which Minh Vu Hoang did business as a sole proprietor. (¶ 40.) The complaint alleges that the sham entities are and always have been instrumentalities and alter egos of Minh Vu Hoang, and  have never had any separate existence. (¶ 51.)

Minh Vu Hoang created sham partnership agreements or caused such sham agreements to be created. (¶ 41.) These purported agreements were not intended to have

---

1.   The complaint asserts claims under § 549 for avoidance unauthorized postpetition transfers (Counts 1C, 2C, 3C, 4C, 5C, and 6C). Those claims were expressly pled in the alternative to the claims under § 542(a). We have decided not to pursue claims under § 549 and therefore do not address them further in this opposition.

2.   All subsequent citations to paragraph numbers without any further identification are to the First Amended Complaint, as are all references to "the complaint."

any legal effect, but were manufactured for the purpose of creating a false and misleading paper record ostensibly showing that the purported partnerships in whose name Minh Vu Hoang's properties were titled really existed. (*Id.*)

For many of the sham partnerships, there were multiple purported partnership agreements. (¶ 42.) And in many such instances, there are fundamental inconsistencies among the various iterations of the purported agreement, with one iteration listing different partners (and/or different percentage interests) than another. (*Id.*) In addition, some purported partnership agreements list only a single partner, who is identified as owning 100% of the interest in the alleged partnership. (*Id.*)

Funds ostensibly belonging to a particular sham entity (for example, proceeds from the sale of property titled in the name of that sham entity) were routinely commingled with funds ostensibly belonging to other sham entities, without any records being maintained to keep track of the amounts ostensibly attributable to each sham entity. (¶ 43.) For example, Funds ostensibly belonging to a particular sham entity (for example, proceeds from the sale of property titled in the name of that sham entity) were routinely used for the benefit of other sham entities. (¶ 44.) In addition, funds ostensibly belonging to a particular sham entity (for example, proceeds from the sale of property titled in the name of that sham partnership) were routinely paid or distributed to or for the benefit of Minh Vu Hoang. (¶ 45.) Moreover, funds ostensibly belonging to Minh Vu Hoang or Thanh Hoang were routinely commingled with funds ostensibly belonging to one or more of the sham entities, with no records being maintained to keep track of what amounts were attributable to who. (¶ 46.)

The complaint alleges upon information and belief that the sham entities had no financial records; that many of the sham entities had no Taxpayer Identification Number; and that Minh Vu Hoang did obtain Taxpayer Identification Numbers for some of her sham entities, but then then used some or all of those numbers for multiple sham entities. (¶¶ 47–49.)

**B.    The bankruptcy filing and Minh Vu Hoang's concealment of the sham entities and of the assets in their names**

Minh Vu Hoang filed for bankruptcy under Chapter 11 on May 10, 2005, and she filed her schedules about two weeks later on May 27. (¶¶ 59–60.) Her schedules and Statement of Financial Affairs failed to disclose any ownership interest in any of the properties or sham entities that are at issue in this case, or in any of the other sham entities that Minh Vu Hoang used in buying and selling real estate. (¶ 60.)

Plaintiff Rosen was appointed as Chapter 11 Trustee in Minh Vu Hoang's bankruptcy on August 31, 2005. (¶ 61.) The case was subsequently converted to Chapter 7 and Rosen was appointed as Chapter 7 Trustee. (¶ *Id*.)

**C.    The defendants' knowledge of Hoang's bankruptcy and their participation with Hoang in concealing estate assets**

Defendants David Dahan and Karin Dahan (David's daughter) learned of Hoang's bankruptcy no later than April 7, 2006, when they contracted with Rosen to buy certain real property from the estate. (¶¶ 64–68.) At that time, and at all relevant times thereafter, David Dahan was a member and/or employee and/or agent of Maia, LLC; Rokama, LLC; and Raymonde, LLC, his knowledge of the bankruptcy is imputed to those entities. (¶¶ 69–71.)

After learning that Hoang was in bankruptcy, David Dahan acted in concert with her to help her conceal her assets. (¶¶ 72–81.) Hoang gave David Dahan a variety of instructions in connection with this endeavor, which he carried out. For example:

- Hoang instructed David Dahan to create Maia, LLC, which he then used as the vehicle through which much of the money at issue in this complaint was funneled as part of Hoang's scheme to hide her assets from the Trustee. David Dahan opened a bank account in Maia's name, which he used in whole or in part for the benefit of Hoang. (¶ 74.)

- Hoang instructed David Dahan to use a home-equity line of credit in his name for her benefit, by drawing funds on the line of credit and giving them to her or otherwise using them as she instructed. (¶ 75.)

- Hoang gave David Dahan written instructions about checks she wanted him to write, and wire transfers she wanted him to send. (¶¶ 76–78.) Several of these are set out in the footnote below.[3]

---

3.      Hello David,

Tomorrow, I need to pay 7207 Greenly [sic] Rd for MAIA,
1) Can I get a Sun Trust check—You can list "cash"—for 176,080 $^{47}/_{100}$
I'll P/U under your mat, & take to Sun Trust.
2) If you have $122,000– I P/U too. If not, Thursday
                          Thank you
                          <u>M</u>

                                                      [¶ 76.]

                          *     *     *     *     *

        on 5/18/07

Maia borrow 56,000 from Eliti [or "Elite"] Realty LLC

                17,400.74
                19,055.03
                <u>    281.10</u>
                36,738.87

- On several occasions, David Dahan applied for loans on properties that were in the name of Maia, LLC. Some or all of the funds deposited into that account were not connected to Maia. Hoang used the account and caused David Dahan to sign checks that were used for other properties. (¶ 79.)

### D.   The First Amended Complaint

This complaint sets out nine sets of counts, numbered 1A–1C, 2A–2C, and so forth. Each set of counts relates to a particular piece of real property that was purchased using assets belonging to Hoang's bankruptcy estate. The motion to dismiss deals only with the first six sets of counts, which involve the following properties:

| | |
|---|---|
| Counts 1A–1C | 3119 Parkway, Cheverly, MD |
| Counts 2A–2D | 6304 Kenhowe Drive, Bethesda, MD |
| Counts 3A–3C | 13416 Sherwood Forest Drive, Bethesda, MD |
| Counts 4A–4C | 7654 Bay Street, Pasadena, MD |
| Counts 5A–5C | 6700 Sundown Rd., Gaithersburg, MD |
| Counts 6A–6B | 11819 Milbern Dr., Potomac, MD |

Each of these sets of counts follows the same basic pattern: First, real property was purchased (post-petition) using funds that were property of Minh Vu Hoang's

| | |
|---|---|
| 10,000 | Escrow to pay expenses |
| 10,000 | Escrow |
| 56,000 | Wire to Maia as loan |

[¶ 77.]

*     *     *     *     *

Hello David,
Please give a check for $146,000.00
I'll take this check to M&T at Edmonston Rd. I'll look for the "lady" you know & ask for a cashier check.
Please write ~~me~~ her a note to tell her it is ok to give a cashier check to me.
check to pay
    FRIEDMAN & MACFADYEN TRUSTEE
                Thanks
                                Minh

[¶ 78.]

bankruptcy estate, and title as taken in the name of one of Minh Vu Hoang's sham entities. Because the properties were bought using estate assets, the properties themselves were estate assets. Second, the property was sold or refinanced. The proceeds of the sale or refinancing constituted estate assets. Third, the proceeds were distributed in whole or in part to one or more of the Dahan Defendants, who received them as agents or nominees for Minh Vu Hoang. The Dahan Defendants therefore acted as conduits or intermediaries with respect to the proceeds.

The specifics as to each set of counts are as follows:

*Counts 1A–1C (3119 Parkway, Cheverly, MD).*[4] David Dahan, Roakama, Sarit Dahan, and Maia received funds from the proceeds of the sale of this property. Specifically, Rokama, LLC received $338,518.78 from the proceeds, and out of that amount $326,000 was disbursed to David Dahan. David Dahan then distributed that money at the instruction of Hoang and for her benefit. He used $180,000 to buy diamonds, which he delivered to Hoang. In addition, $146,000 was used to pay down balances owed on a home-equity line of credit in the name of David Dahan and Sarit Dahan, which was secured by a deed of trust on their residence. An equal amount was subsequently drawn against the line of credit and used for Hoang's benefit.[5] Finally, Maia, LLC received $7,914.59 from the proceeds that were initially received by Rokama, LLC.

---

4.  ¶¶ 93–112.

5.  This check seems to be the one that Minh Vu Hoang told David Dahan to give her in one of the handwritten notes quoted in ¶ 78 of the complaint and in footnote 3, above.

*Counts 2A–2C (6304 Kenhowe Drive, Bethesda, MD).*[6] David Dahan, Rokama, Sarit Dahan, and Maia received funds from the proceeds of the sale of this property located at 6304 Kenhowe Drive, Bethesda, Maryland (hereinafter, "6304 Kenhowe Drive"). Specifically, Rokama, received $596,547.25 from the proceeds, which David Dahan caused to be distributed to Maia.  David Dahan then caused the $78,000 of the funds distributed to Maia to be deposited into a bank account that was in the joint names of David Dahan and Sarit Dahan.

*Counts 3A–3C (13416 Sherwood Forest Drive, Bethesda, MD).*[7] As described below, David Dahan, Rokama, Sarit Dahan, and Maia received funds totaling $307,975 from the proceeds of a line-of-credit loan secured by a deed of trust on this property. *First*, $230,500 was used to pay down balances owed on a home-equity line of credit in the name of David Dahan and Sarit Dahan, which was secured by a deed of trust on their residence. Funds drawn on this line of credit were paid to Hoang. *Second*, $29,000 was paid to Maia. *Third*, $34,475 was deposited into a bank account in the name of David Dahan and Sarit Dahan. *Fourth*, $10,000 was used for the benefit of Maia by being paid to the architect working on a real-estate project owned by Maia. *Fifth*, $4,000 was used for the benefit of David Dahan by being paid to a contractor doing work on a property owned by David Dahan.[8]

---

6.  ¶¶ 146–47.

7.  ¶¶ 202–18.

8.  In addition, $41,451.65 of the sales proceeds was used to pay taxes and loan fees.

*Counts 4A–4C (7654 Bay Street, Pasadena, MD).*[9] David Dahan and Sarit Dahan
received the benefit of $150,000 from the proceeds of the sale of this property.
Those funds were used to pay down balances owed on a home-equity line of
credit in the name of David Dahan and Sarit Dahan, which was secured by a
deed of trust on their residence. Funds drawn on this line of credit were paid
to Hoang.

*Counts 5A–5C (6700 Sundown Rd., Gaithersburg, MD).*[10] Maia received $56,000
from the proceeds of the sale of this property.[11]

*Counts 6A–6B (11819 Milbern Dr., Potomac, MD).*[12] Rokama received $15,000
from the proceeds of the refinancing of this property.

There is also an additional count (Count 2D) regarding a promissory note
executed by David Dahan and Maia LLC in connection with the sale of the Kenhowe
Drive property. (¶¶ 195–201). The note was in the original principal amount of $596,456
and it was ostensibly payable to "Kaplan Funding," which was one of Hoang's sham
entities. It was payable in full no later than October 17, 2007. (¶ 196.)

The complaint alleges, based on the following, that this promissory note
represented proceeds of the sale of 6304 Kenhowe Drive (¶ 197): First, Hoang's purpose
in having David Dahan execute the promissory note was to ensure that she would have
recourse against him and against Maia, LLC if the sales proceeds were not used for her

---

9.   ¶¶ 244–55.

10.  ¶¶ 268–77.

11.  This payment seems to be the one that Minh Vu Hoang told David Dahan make in the
      handwritten notes quoted in ¶ 77 of the complaint and in footnote 3, above.

12.  ¶¶ 288–94.

benefit.  (¶ 197.a.) Second, the consideration for the Note was the distribution of the sales

proceeds.  (¶ 197.b.) Thus, the note and the obligation that it evidenced constitute

property of Hoang's bankruptcy estate.  (¶ 197.c.) The note came due on October 17,

2007, at which point David Dahan and Maia, LLC were obligated to pay Rosen the entire

principal amount, plus interest.  (¶ 198.) However, none of those amounts have been paid.

(¶ 200.)

<strong>Argument</strong>

**A.  Turnover liability is not limited to estate property that was in the defendants' possession, custody, or control when the petition was filed and that remained in their possession when the complaint was filed**

Counts 1A, 2A, 3A, 4A, 5A, and 6A assert claims for an accounting under

Bankruptcy Code § 542(a)—the Code's "turnover" provision. The Dahan Defendants

argue that these counts fail to state a claim because § 542(a) "is limited in its application

to property that a defendant was in possession of at that time of the filing of the bank-

ruptcy case and remained in possession of at the time that a Complaint is filed."[13] They

are mistaken. The Dahan Defendants are subject to liability under § 542(a) even though

(1) they first obtained possession of the property at issue after the petition was filed and

(2) they no longer possessed the property when this proceeding was commenced.

***1.   The Court has already considered this argument and rejected it.***

The argument now raised by the Dahan Defendants was previously raised by the

defendants—and rejected by the Court—in *Rosen v. Gemini Title & Escrow, Inc.*[14] Like

the Dahan Defendants, the defendants in *Gemini Title* filed a motion to dismiss arguing

---

13.  Dahan Defs.' Mem. 4–5.

14.  No. 09-ap-853 (Bankr. D. Md. filed December 19, 2009).

(among other things) that liability under § 542(a) could be imposed only where the defendant had acquired the property at issue prepetition and still had possession of the property when the proceeding under § 542(a) was commenced.[15] The Court rejected that argument, holding that the claims under § 542(a) in *Gemini Title* were legally sufficient.[16] Nothing distinguishes the Dahan Defendants' argument here from the argument that the Court rejected in *Gemini Title*.

And even if the Court had not already decided the issue, the Dahan Defendants' argument would fail on the merits, as we now show.

**2.    *Liability under § 542(a) is not limited to cases in which the defendant obtained possession of the property at issue prepetition.***

The argument that § 542(a) applies only to property obtained by the defendant prepetition is inconsistent with the provision's plain language. Section § 542(a) provides that the duty to turn over property of the estate applies to anyone who is in possession, custody, or control of such property "during the case[.]"[17] If Congress had intended the duty to apply only to those who had possession, custody, or control of estate property at the beginning of the case, it would have said so.

This point is confirmed by the legislative history of § 542(a), which shows that the language enacted by Congress represented a conscious decision that the turnover duty should not be limited in the way advocated by the Dahan Defendants. In the bills that were reported out of committee to the full House and Senate, § 542(a) applied to entities in possession, custody, or control of estate property "on the date of the filing of the peti-

---

15. DE 9, *Rosen v. Gemini Title & Escrow, Inc*, No. 09-ap-853.

16. DE 23, 24, *Rosen v. Gemini Title & Escrow, Inc*, No. 09-ap-853.

17. 11 U.S.C. § 542(a).

tion[.]"[18] But the bills were amended at the last minute to apply to entities in possession, custody, or control of estate property "during the case[.]"[19] Thus, the actual statutory language represents a deliberate choice to cover entities that obtain possession of estate property after the petition is filed. Comments about the amendment in the Congressional Record confirm this: "The section makes clear that any entity, other than a custodian, is required to deliver property of the estate to the trustee or debtor in possession *whenever such property is acquired by the entity during the case*."[20]

The case on which the Dahan Defendants rely—*Deckelbaum v. Cooter, Mangold, Tompert & Chapman, PLLC*[21]—is wrongly decided and should not be followed. The court in *Deckelbaum* ignored both the plain language of § 542(a) and the legislative history that we have discussed. In addition, it relied inappropriately on the Fourth Circuit's decision in *Vogel v. Russell Transfer, Inc.*,[22] which did not involve § 542 and did

---

18. S. 2266, 95th Cong., § 542(a) (Oct. 31, 1977) (Attachment 1 hereto); H.R. 8200, 95th Cong., § 542(a) (Feb. 8, 1978) (Attachment 2 hereto).

19. 124 Cong. Rec. H11047, H11060 (daily ed. Sept. 28, 1978) (Attachment 3 hereto); 124 Cong. Rec. S17403, S17413 (daily ed. Oct. 6, 1978) (Attachment 4 hereto).  *See* Thomas E. Plank, *The Outer Boundaries of the Bankruptcy Estate*, 47 Emory L.J. 1193, 1251–52 (1998):

> Just before final passage of the Code, Congress made last minute amend-
> ments to the bills that became the Code. One amendment changed the
> reference to the timing of an entity's possession or control of property in
> § 542(a) from "on the date of the filing of the petition" to "during the
> case."

20. 124 Cong. Rec. H11096–97 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards) (emphasis added) ) (Attachment 3 hereto); 124 Cong. Rec. S17413 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini) (emphasis added) (Attachment 4 hereto).  Note that the committee reports that are reprinted in the United States Code & Administrative News predate the last-minute amendment, and therefore discuss a version of the § 542(a) that was never enacted. H.R. Rep. No. 95-595 at 369, 95th Cong., 1st Sess. 369 (Sept. 7, 1977), 1978 U.S. Code Cong. & Ad. News 5963, 6325, 1977 WL 9628; S. Rep. No. 95-989 at 84, 95th Cong., 2d Sess. 84 (July 14, 1978), 1978 U.S. Code Cong. & Ad. News. 5787, 5870, 1978 WL 8531.

21. 275 B.R. 737 (D. Md. 2001).

22. 852 F.2d 797 (4th Cir. 1988), *cited in Deckelbaum*, 275 B.R. at 741.

not even cite that provision. Another decision cited in *Deckelbaum*—*In re 31-33 Corp.*[23]—had erroneously relied on portions of § 542(a)'s legislative history that related to the originally drafted language, and that was therefore irrelevant to the language that was ultimately enacted.[24] The court in *31-33 Corp.* was apparently unaware that the language it was quoting referred to proposed language that had been abandoned, and it did not refer to the statements that we have quoted from the Congressional Record, which undercut its conclusion.[25]

What is more, *Deckelbaum* and *31-33 Corp.* are at odds with the decisions of several other courts, which correctly interpreted § 542(a) according to its plain meaning

---

23.  100 B.R. 744 (Bankr. E.D. Penn. 1989).

24.  100 B.R. at 747 (citing H.R. Rep. No. 95-595 at 369, *supra* note 20, and S. Rep. No. 95-989 at 84, *supra* note 20)

25.  *Deckelbaum* also cited *Miller v. Lane*, 167 B.R. 729 (Bankr. E.d. Mass. 1981), which held that when the defendant obtained the property at issue postpetition, recovery under § 542(a) is available only if the trustee could succeed on an avoidance action under § 549. *Miller*, 167 B.R. at 732. But no avoidance action is necessary (or available) where, as is alleged here, the defendant did not obtain possession of the property as a result of a "transfer."

The law in this circuit, as elsewhere, is that receipt of estate property, without more, does not render the recipient a transferee. Rather, a recipient is a transferee only if he has legal dominion and control over the property such that he can use it for his own benefit. *E.g.*, *In re Southeast Hotel Properties L.P.*, 99 F.3d 151, 155–56 (4th Cir. 1996); *In re Columbia Data Products, Inc.*, 892 F.2d 26, 28 (4th Cir. 1989); *In re Baker & Getty Financial Services, Inc.*, 974 F.2d 712, 722 (6th Cir. 1992); *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893–95 (7th Cir. 1988). In contrast, someone who acts as a mere "conduit" for the property is not a transferee.

The First Amended Complaint alleges that the Dahan Defendants obtained possession of estate property as conduits. (First Am. Compl. ¶¶ 114, 123, 125, 168, 175, 177, 180, 220, 227, 257, 279, 305.) By definition, therefore, they  are not transferees. As a result, there are no postpetition transfers that would need to be avoided under § 549 as a prerequisite of imposing liability under § 542(a).

and have applied it where, as here, the defendant received estate property after the petition was filed.[26]

Contrary to what the Dahan Defendants contend, *Deckelbaum* is not binding on this Court, even though it was decided by district-court judge in this district. Although courts are not unanimous on the issue, most cases (including the overwhelming majority of recent cases) hold that bankruptcy courts are not bound by the decisions of individual district judges in their respective districts.[27] This conclusion rests on several bases.

*First*, given that decisions of a single district judge do not bind other judges in the same district, such decisions do not constitute stare decisis to begin with.[28] That being the case, there is no reason why they should bind bankruptcy courts.

*Second*, although bankruptcy-court decisions are appealable to the district court, bankruptcy courts are not "subordinate" to district courts in the same way that district courts are subordinate the courts of appeals and that all lower federal courts are subordinate to the Supreme Court; rather, bankruptcy courts are *units of* the district courts.[29]

---

26. *E.g.*, *In re Suncoast Towers South Associates*, No. 98-10537-BKC-AJC, 1999 WL 549678 at *13 (Bankr. S.D. Fla. July 19, 1999).

27. *E.g.*, *Official Committee of Unsecured Creditors of BankUnited Fin. Corp. v. Fed. Deposit Ins. Corp.* (*In re BankUnited Fin. Corp.*), 442 B.R. 49, 56–57 n.7 (Bankr. S.D. Fla. 2010); *In re Moore*, 441 B.R. 732, 738 (Bankr. N.D.N.Y. 2010); *Bucchino v. Wells Fargo Bank, N.A.* (*In re Bucchino*), 439 B.R 761, 770 (Bankr. D.N.M. 2010); *McCarthy v. Nandalall* (*In re Nandalall*), 434 B.R. 258, 269 n.7 (Bankr. N.D.N.Y. 2010); *In re Lane*, No. 08-73187, 2010 Bankr. LEXIS 18 at *4–7 (Bankr. C.D. Ill. Jan. 12, 2010); *In re Ford*, 415 B.R. 51, 60–61 (Bankr. N.D.N.Y. 2009); *In re Romano*, 350 B.R. 276, 277–81 (Bankr. E.d. La. 2005); *In re Shattuc Cable Corp.*, 138 B.R. 557, 565–67 (Bankr. N.D. Ill. 1992); *First of America Bank v. Gaylor* (*In re Gaylor*), 123 B.R.236, 241–43 (Bankr. E.D. Mich. 1991).

28. *E.g.*, *Garcia v. Gomez*, 534 F.3d 1320, 1329 (10th Cir. 2008); *Fishman & Tobin, Inc. v. Tropical Shipping & Constr. Co.*, 240 F.3d 956, 965 (11th Cir. 2001).

29. 28 U.S.C. § 151; *see, e.g.*, *In re Moore*, 441 B.R. at 738; *In re Romano*, 350 B.R. at 281; *In re ShattucCable Corp.*, 138 B.R. at 565, 566; *First of America Bank v. Gaylor*, 123 B.R. at 243

*Third*, treating decisions of a single district judge as binding on bankruptcy courts would be unworkable in any district, such as this one, in which there is more than one district judge.[30] Since the decision of a single district judge does not constitute "law of the district" binding on other judges in that district, bankruptcy judges and litigants could be subject to conflicting "binding" precedents.[31] And even if there were no conflicting decisions at the time the bankruptcy court acted, the law that would be applied on appeal would be unpredictable, because there would always be the possibility of obtaining a decision that created a conflict. Losing litigants would therefore have an unusually strong incentive to appeal.[32] In both of these respects, the relationship between the bankruptcy court and the district court differs fundamentally from the relationship between a district court and a court of appeals. Because the decision of one appeals-court panel does constitute binding circuit law, there is much less opportunity for conflicting precedents to arise. And the law that will be applied on appeal is relatively predictable, which discourages roll-the-dice appeals.

For these reasons, this Court is not bound by the district court's decision in *Deckelbaum*.

**B.  The amended complaint states a claim for conversion of money because the money at issue is specifically identifiable.**

Counts 1B, 2B, 3B, 4B, 5B, and 6B all assert claims for conversion based on the same facts underlying the claims under § 542(a). The Dahan Defendants move to dismiss these counts on the ground that money is generally not a form of property that is subject

---

30. *E.g.*, *First of America Bank v. Gaylor*, 123 B.R. at 241.

31. *E.g.*, *First of America Bank v. Gaylor*, 123 B.R. at 241.

32. *First of America Bank v. Gaylor*, 123 B.R. at 241–42.

to conversion. They recognize that money *is* subject to conversion if it takes the form of "specific segregated or identifiable funds."[33] They nevertheless contend that Rosen has failed to adequately allege that the funds at issue here were identifiable: "There was no trust account. There was no money held in escrow. No money was segregated for a particular purpose."[34] This argument fails.

While the factors cited by the Dahan Defendants (the absence of a trust account and so forth) are relevant to the existence of *segregated* funds, they are not determinative of whether the funds at issue were *identifiable*. Even when funds from multiple sources are commingled in a single account, techniques of equitable tracing can often be used to identify funds as coming from a particular source, and in such a case those funds are sufficiently identifiable to be subject to conversion.[35] One such technique is "lowest intermediate balance" analysis, under which "a court follows the trust fund [in this case, estate assets] to and decrees restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund."[36] If the amount in the account falls below the amount of the trust funds (or here, estate funds), the lowest intermediate balance in the account represents the amount identifiable as trust (estate) assets, and if the account is depleted and then replenished from other sources, none of the new deposits are regarded as trust (estate) assets.[37]

---

33. Dahan Defs.' Mem. at 7.

34. *Id.*

35. *See, e.g.*, *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439–42 (7th Cir. 2005); *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004); *Bombadier Capital, Inc. v. Key Bank of Maine*, 639 A.2d 1065, 1066–67 (Me. 1994).

36. *Ferris, Baker Watts, Inc. v. Stephenson* (*In re MJK Clearing, Inc.*), 371 F.3d 397, 402 (8th Cir. 2004).

37. *Id.*

The complaint alleges that the funds received by the various Dahan Defendants represented proceeds of the sale of property belonging to the estate.[38] Given those allegations, the complaint is reasonably understood to describe the funds as being *identifiable* as proceeds of estate property. (The sufficiency of the allegations that the various real properties were estate assets has not been challenged.)

However, to eliminate any possible doubt on this score, we would propose to further amend the complaint to provide details explaining in more detail the manner in which the funds are identifiable as estate property. Those details are as follows:

*Count 1B (3119 Parkway, Cheverly, MD).*[39] The proceeds from the sale of this property were distributed by the title company in the form of two checks. The first check, which was in the amount of $192,518.78 and was payable to Rokama, LLC, was used to open a bank account in the name of Rokama, LLC. No other funds were deposited into that account, so all funds disbursed from the account are identifiable as part of the sales proceeds. One of those disbursements was a $180,000 check payable to "Dahan Yosef Diamond," which was used to buy diamonds that David Dahan delivered to Minh Vu Hoang. In addition, $7,914.59 was disbursed to Maia, LLC in the form of a $1,500 check payable to Maia and a cashier's check purchased with funds from the Rokama bank account, both of which were deposited into a bank account in the name of Maia.

The second title-company check, which for $146,000 and was payable to M&T Bank, was used to pay down the balance owed on a home-equity line of credit that M&T Bank had extended to David and Sarit Dahan, which was secured by a deed of trust on their residence. Because the payment was made with the check issued by the title company, it is identifiable as part of the sales proceeds. David Dahan subsequently used funds drawn on the home-equity line of credit to buy a cashier's check that was used as for the benefit of Minh Vu Hoang.

*Count 2B (6304 Kenhowe Drive, Bethesda, MD).*[40] The entire amount of the net sales proceeds ($596,547.25) was paid to Rokama, LLC in the form of three checks from the settlement attorney payable to Rokama, which were used as

---

38. First Am. Compl. ¶¶ 110–13, 166–67, 218–19, 152–56, 276–78, 297–304.

39. ¶¶ 93–112.

40. ¶¶ 146–47.

the opening deposit of a bank account in Rokama's name. No other funds were deposited in the account (other than interest on the deposited funds). One week after the account was opened, the entire amount of the original deposit was transferred into an account at the same bank in the name of Maia, LLC. From that account, $78,000 was transferred to an account in the name of David Dahan and Sarit Dahan. The lowest balance in the account before that transfer was made was $340,981.16. Therefore, the entire $78,000 is identifiable as money that was transferred from the Rokama account, which is in turn identifiable as proceeds of the sale of the Kenhowe Drive property.

*Count 3B (13416 Sherwood Forest Drive, Bethesda, MD).*[41] Maia, LLC took out a $400,000 home-equity line of credit secured by this property. All but $0.35 of the available credit was drawn against that line, and none was repaid. Therefore, all amounts drawn against the line represent equity in the Sherwood Forest property that was extracted from the property—i.e., proceeds of the property. All the uses of funds that are identified in the complaint represent draws against the line of credit and are therefore identifiable as proceeds of the Sherwood Forest property.

*Count 4B (7654 Bay Street, Pasadena, MD).*[42] The proceeds of the sale of this property were paid to Ballenger General Partnership in the form of a check for $578,016.75, which was used as the opening deposit of an account in the name of Ballenger General Partnership. Subsequently, $150,000 from that account was used to buy a cashier's check in that amount payable to M&T Bank. That check was used to pay down balances owed to that bank under a home-equity line of credit obtained by David Dahan and Sarit Dahan, which was secured by a deed of trust on their house. The only deposit made into the Ballenger account between the opening of the account and the purchase of the cashier's check was the *re*deposit of $260,000 that had previously been withdrawn from the account to purchase a $260,000 cashier's check. That cashier's check was returned to the issuing bank endorsed, "Not use [sic] for purpose intended" and the amount of the check was recredited to the account.

*Count 5B (6700 Sundown Rd., Gaithersburg, MD).*[43] The entire net proceeds of the sale of this property was paid by the title company in the form of a check payable to Elite Realty, LLC in the amount of $362,315.31. That check was deposited into a bank account in the name of Elite Realty, LLC. Seven days later, $56,000 was wired from that account into an account in the name of Maia, LLC. In the time between the deposit of the $362,315.31 and the wire of the $56,000, no other funds were deposited into or taken out of the Elite Realty account.

---

41. ¶¶ 202–18.

42. ¶¶ 244–55.

43. ¶¶ 268–77.

*Count 6B (11819 Milbern Dr., Potomac, MD).*[44] From the proceeds of the refinancing of this property, the title company wrote a check payable to J. Noda Remodeling in the amount of $101,500, which was deposited in a bank account in the name of that entity. Immediately prior to that deposit, the account was overdrawn. Subsequently, $15,000 from the account was used to buy a cashier's check payable to Rokama, LLC, which was deposited in a bank account in the name of Rokama. The lowest balance in the Noda account between the deposit of $101,500 and the withdrawal of the $15,000 was $91,031.

**C.  The promissory-note claim is timely, because it is a claim to *collect on* the note, not a claim for conversion of the note.**

In Count 2D, Rosen collect the amounts due under a promissory note executed by David Dahan and Maia LLC in which the ostensible payee was one of Minh Vu Hoang's sham entities. The Dahan Defendants' argument regarding this count misses the mark because it is based on a misunderstanding of what that count alleges.

Contrary to what they seem to think, Count 2D does not assert a claim for conversion of the promissory note. Rather, it is a claim to *enforce* the note. Therefore the statute of limitations did not begin to run until the note matured, which was less than three years before the tolling agreement took effect.

The complaint alleges that David Dahan and Maia, LLC executed and delivered to Minh Vu Hoang a promissory note in the amount of $596,456, which was ostensibly payable to "Kaplan Funding."[45] Kaplan Funding was one of Minh Vu Hoang's sham entities.[46] The complaint further alleges that the Note represented proceeds of the same of real property that belonged to Minh Vu Hoang's bankruptcy esatate, and that "[t]he Note

---

44. ¶¶ 288–94.

45. First Am. Compl. ¶ 196.

46. *Id.*

and the obligation that it evidenced" constitute estate property.[47] Finally, the complaint alleges that when the promissory note matured, David Dahan and Maia, LLC were obligated to pay the principal and interest to Rosen.[48]

Thus, Rosen seeks in Count 2D to enforce the rights under the note of the note's ostensible payee. He does not sue on a theory of conversion.

As a result, the Dahan Defendants' argument is directed at a straw man. Even if they are correct in arguing that a cause of action for conversion would accrue on the date the note was executed, that would not be the accrual date for a suit to *enforce* the note. That cause of action did not accrue until the note came due, which occurred on October 17, 2007.[49] That date was more than three years before the effective date of Rosen's tolling agreement with the Dahan Defendants.[50] Count 2D is therefore timely.

### Conclusion

For the foregoing reasons, the motion to dismiss should be denied and Rosen should be granted leave to file a second amended complaint.

---

47. *Id.*¶¶ 197–98.

48. *Id.* ¶ 199.

49. *Id.* ¶¶ 196, 199.

50. *See id.* ¶ 85 (tolling agreement was effective as of March 11, 2010).

Respectfully submitted,

_/s/ Neal Goldfarb_
Richard H. Gordin, No. 02634
Max Maccoby, No. 16653
Neal Goldfarb, No. 05396
BUTZEL LONG TIGHE PATTON, PLLC
1747 Pennsylvania Ave., NW, Suite 300
Washington, D.C. 20006
T: (202) 454-2800 ▪ F: (202) 454-2805
rgordin@butzeltp.com
mmaccoby@butzeltp.com
ngoldfarb@butzeltp.com

Roger Schlossberg, No. 02021
SCHLOSSBERG & ASSOCIATES
134 West Washington St.
P.O. Box 4227
Hagerstown, MD 21741
T: (301) 739-8610 ▪ F: (301) 791-6302
rschlossberg@schlosslaw.com

_Counsel for Plaintiff_

**Certificate of Service**

I HEREBY CERTIFY that on this 29th day of April, 2011, the foregoing Plaintiffs'

Opposition to the Dahan Defendants' Motion to Dismiss Counts I–VI of the First Amended

Complaint was served on the following (constituting counsel for all parties who are not in default

for failure to respond to the summons and complaint) via the Court's ECF system:

> Richard Stolker, Esq.
> 110 N. Washington St., Suite 320
> Rockville, Maryland 20850
> rstolker@stolker.com
> *Counsel for defendants David Dahan;*
> *Karin Dahan; Sarit Dahan; Maia, LLC;*
> *Rokama, LLC; and Raymonde, LLC*
>
> Jeffrey M. Orenstein, Esq.
> Goren, Wolff & Orenstein, LLC
> Shady Grove Plaza
> 15245 Shady Grove Road
> North Lobby, Suite 465
> Rockville, Maryland 20850
> jorenstein@gwolaw.com
> *Counsel for defendants David Dahan;*
> *Karin Dahan; Sarit Dahan, Maia, LLC;*
> *Rokama, LLC;, and Raymonde, LLC*
>
> Morton A. Faller, Esq.
> Shulman, Rogers, Gandal, Pordy & Ecker
> 12025 Park Potomac Ave., 6th Floor
> Potomac, MD 20854
> mfaller@shulmanrogers.com
> *Counsel for Capital Bank, N.A.*
>
> Bennie Brooks, Esq.
> 8201 Corporate Drive, Suite 260
> Landover, MD 20785

> ____/s/ *Neal Goldfarb*_____
> Neal Goldfarb